SILAS COLVIN *et al.*

*v.*

JOHN WEEDMAN *et al.*

1. CONTRACT OF SALE—*as to the time of delivery.* A contract of sale of a large number of cattle, which were being herded in different lots a considerable distance apart, provided that they should be delivered from one day named, to another, as, from the 1st to the 10th of the month, at the option of the purchaser: *Held,* that before the vendor could be put in default for not delivering the cattle, the purchaser should make his election of time for the delivery, and give the vendor reasonable notice thereof, so as to enable him to perform his part of the agreement.

2. Or should the time for delivery be extended, by agreement of parties, so that the last day for the buyer's option should be postponed, the like duty of giving notice would devolve upon the buyer.

3. And where, at the instance of the buyer, the vendor consents that he may take a less number than was originally sold, the former expressly agreeing to give notice when he would receive the residue, such notice must be given before the vendor can be put in default for non-delivery.

4. In this case the cattle sold were owned by several persons, two of whom were in charge of the different lots at different places; the buyer obtained the consent of one of the vendors, as the time for delivery was approaching, that he should take a small number then, agreeing to notify the vendor when he would be ready to take the residue. The buyer then went to another of the vendors who was in charge of one of the lots of the cattle, from which the buyer was to take the smaller number he then was to have, and concealing from him the fact of the change in the agreement, induced him to drive that lot to one of the several points named in the original agreement, at which the whole number sold were to have been delivered, and when there, the buyer refused to take them, alleging, in general terms, that they did not fill the contract: *Held,* that the buyer could not put the vendors in default in that mode; he should have given the notice he agreed to give, so as to have enabled the vendors to make the delivery, if it was his desire to have all the cattle at that time and place.

5. SAME—*of objections to the quality of the property to be delivered.* It was not enough for the buyer in such case, to object, in general terms, that the lot of cattle so offered him did not fill the contract. If he designed receiving the lots in different places at different times, he should have stated his objections specifically, so that they might have been obviated by supplying the place of those which were not of the requisite quality, from the other lot of cattle.

6. Same—*readiness on the part of the purchaser, to pay.* In an action by a purchaser against his vendor to recover back a part of the purchase price which he had paid in advance, alleging as his ground for recovery that the vendor had failed to deliver, or offer to deliver, property of the quality purchased, it appeared that at the time he objected he did not have the money to pay, as was required by the agreement, and that fact of a want of readiness to pay was held fatal to his right of recovery.

Appeal from the Circuit Court of McLean county; the Hon. John M. Scott, Judge, presiding.

The opinion contains a sufficient statement of the facts in this case.

Messrs. Tipton, Benjamin & Rowell, and Messrs. Williams & Burr, for the appellants.

1st. By the terms of the contract, the cattle were "all to be put in a dry lot at sundown, and remain there without feed or water, until sunrise the next morning, without weighing." The entire lot, purchased under the contract, were two hundred head, and one hundred and sixty-nine head were tendered to Colvin by Hand, at the time and place agreed upon.

Another condition of the contract was, that the two hundred head were all to be " steers, from three to six years old,"— " there is to be no stags or very rough oxen in the entire lot."

2d. The first condition precedent in the contract was violated by Hand, when, as the proof shows, the one hundred and sixty-nine head of cattle so tendered to Colvin, were put over night in a lot containing about two acres, with a pond of water in it sufficient to water about five hundred head.   The proof further shows that cattle so confined over night, with access to water, would by morning absorb from fifty to seventy-five pounds additional weight.

3d. The second condition precedent in the contract was also violated, when, as the proof shows, out of the one hundred and sixty-nine head so tendered, there were four very rough cattle,

one cow, three stags, eight oxen from seven to fourteen years old, two very lame, and one steer sick and very poor.

The tender was not a substantial compliance with the requirements of the contract, and Colvin was not bound to accept the cattle so tendered. *Harris* v. *Bradley,* 9 Ind. 166; *Bales* v. *Weddle,* 14 Ind. 353; *McCoy* v. *Julien,* 15 Iowa 372; *Trinkle* v. *Reeves,* 25 Ill. 214. Having violated the contract, Colvin was entitled then to rescind, and his right of action was then complete, to recover back whatever money had been advanced by him on the contract.

Messrs. Greene & Littler, for the appellees.

Appellees fully kept and performed the contract in good faith, so far as they could do, without the like performance of appellants on their part. Appellants not only violated their contract, but did so wilfully and fraudulently.

1st. Appellants could not, as the proof shows, comply with their original contract for want of money. On the receipt of notice, appellees were fully prepared, and so continued, to perform the contract on their part, until and after the last day of the extended time; so far as the original contract is concerned, appellees were not, but appellants were, in default.

2d. Under the subsequent verbal agreement entered into between the parties on the 9th of September thereafter, and which was understood to supersede the original contract between the parties, and of which Weedman had no notice, and under which Colvin was then ostensibly acting, he, Colvin, was not then entitled to demand more than the three car loads of cattle, which he had obtained permission then to take, without previous payment.

3d. Colvin did not give notice that it was too late to deliver at any of the places named in the original contract, until after the expiration of the time agreed upon, and was not in a position to insist upon a technical breach, so long as the other party was willing to comply substantially, and he himself was

in default. Had he made a demand, either in conformity with the written contract, or with the subsequent agreement made by Hand, and given the proper notice, and had Weedman then failed in any particular, he might have complained. But one contracting party cannot complain that the other did not properly perform a condition never agreed upon. Colvin might elect to rescind a losing contract, even for a technical breach, but he could not commit a fraud in order to produce that breach, and then take advantage of it.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was an action of assumpsit, brought to the Circuit Court of McLean county, by Silas Colvin and James Funk, against John Weedman, George W. Hand and Philip Weedman, to recover back $1,000, paid by the plaintiffs to the defendants on " a cattle contract," and a verdict for the defendants. A motion for a new trial was overruled, and judgment rendered on the verdict.

To reverse this judgment, the plaintiffs appeal to this court, assigning various errors.

The contract between the parties was in writing, and was as follows:

"Know all men by these presents, That we, George W. Hand and Philip Weedman, of Humboldt county, State of Iowa, have this day sold to Silas Colvin and James Funk, two hundred head of steers, from three to six years old. There is to be no stags or very rough oxen in the entire lot. The cattle are to be delivered as follows, to-wit: . The entire lot from the first to the tenth of September, at the option of the buyers, and to be delivered to Colvin and Funk, at either Hart & Fuller's, or at Fort Dodge scales, in Webster county, or at Ridgeport scales, in Boone county, Iowa. The cattle are all to be put in a dry lot at sundown, and remain there without feed or water until sunrise next morning, before weighing. After the cattle are weighed, said Hand and Weedman are to

send men to drive all said cattle to the nearest railroad station, from which the cattle are to be shipped, but they are not to be held accountable for accident or loss after the weighing. Said Colvin & Funk are to pay us five dollars and fifty-five cents per one hundred pounds for said cattle, gross weight, on delivery.

"Bloomington, Ill., May 23d, 1867."

On the day of the date of the contract, plaintiffs paid $1,000 thereon.

By request of the plaintiffs, made in August, the time for the delivery of the cattle was postponed to the 15th of September.

The right of the plaintiffs to recover, depends upon their showing a readiness to perform on their part, and of failure on the part of the defendants.

There were three places specified in the contract, where the cattle should be delivered, either at Hart & Fuller's or Fort Dodge, both in Webster county, where forty head of the cattle were, or at Ridgeport scales in Boone county, where one hundred and sixty-nine head were, under the care of Philip Weedman, who was there herding them. These places were sixty-five miles apart, and by the contract, it was at plaintiffs' option at which of these places they should be delivered.

Colvin visited Hand in Iowa, the eighth of September, and in their conversation about the cattle, he told Hand he was not prepared to take them all, that he had not the money to pay for them, and got Hand's consent that he should ship two or three car loads without paying for them, he being allowed to pay John Weedman, at Bloomington. It was then agreed that Colvin should go to Boone and see the cattle Philip Weedman was herding, and when he had determined what he would do he should give Hand notice, so that the cattle might be collected in one bunch and driven to the scales. Colvin, with one Crose, acting on the part of Hand, who was to introduce Colvin, as he was a stranger to Weedman, started to Boone county, and when Boonesborough was reached, Crose,

having some other business, declined going further, and signed a letter or order which Colvin wrote, directed to Weedman, apprising him of this new arrangement with Hand. Colvin proceeded on to the herd, and there, on the tenth, saw Philip Weedman, and looked through the cattle. He returned on the thirteenth, but did not inform Weedman of this new arrangement with Hand, but made the impression on him that he had come to receive and pay for the cattle. He had then but about two thousand dollars with him. Willis' scales was then agreed upon as the place for weighing. This was on Friday, the thirteenth of September. By driving on Saturday and Sunday, during which days there was a heavy fall of rain, Willis' was reached about dark, Sunday evening, and the cattle put in a lot of about one and a-half acres. Colvin was there and saw the lot. There was a pond of water in it, caused by the rains, sufficient to water three hundred head.

It is evident from these facts, that Weedman was acting under the impression that Hand had agreed with Colvin that he should deliver the one hundred and sixty-nine head he had in charge to Colvin, whereas, under this agreement with Hand, which Colvin concealed from Weedman, he was entitled to receive but two or three car loads—some sixty head—and if he concluded to take the whole number contracted for, he was to give Hand notice, so that the herd in Webster county, at Fort Dodge, might be consolidated with Weedman's herd, and so driven together to the scales. This notice Colvin never gave, but permitting Weedman to act on the false impression he had produced upon him by his conduct, and his failing to show the writing which Crose, under the authority of Hand, have given him to show to Weedman, he sought, by this appearance of a readiness to receive the cattle, to put defendants in default, so that he himself might escape from the contract. Accordingly, the next morning, Monday, 16th, seeing the cattle in the lot, and being told by Weedman they were for him, except two oxen and a cow, which they did not propose to put in, Colvin said, without stating any particular

objection, that he would not take them—that they did not fill the contract. It is in proof that, save a few head which Weedman proposed should be thrown out, the rest of the cattle were the best kind of Iowa cattle, and this, by the admission of Colvin himself. It is not denied, that Colvin, at this time, was not prepared to pay for the cattle, and there is evidence tending to show he wanted to get out of the contract.

It is very evident defendants could not be in default for failing to deliver two hundred head of cattle, nor did Colvin make the objection there was not that number at Willis'; the defendants could not be put in default on this account, for the reason, Colvin had not notified Hand of his final determination, as the proof shows he had promised to do. This notice was important, as the herds were separated, and time was required to enable defendants to consolidate them, and drive them, by the appointed time, for delivery. When Colvin parted from Hand, at Fort Dodge, the arrangement was, that Colvin, after seeing the cattle in charge of Weedman, in Boone county, should then determine whether he would take two or three car loads, and pay John Weedman for them in Bloomington, or take the whole, and notify Hand accordingly. His right to demand the two hundred head depended upon his giving this notice to Hand, which he did not give.

The proof is conclusive, that Colvin, when at Willis', had not the money to pay for the cattle, not even for the bunch offered to him by Philip Weedman. This, of itself, would defeat the plaintiffs' claim to recovery.

But did not the cattle offered fill the contract? There can be no doubt about this, even on the admission of Colvin. The exceptionable ones in the lot, Weedman proposed to throw out, and when thrown out there is left no doubt that the remainder filled the contract. Colvin, however, made no specific objection to any of them, contenting himself with saying they did not fill the contract.

It is ingeniously argued by appellants' counsel, that his objection included every objection which, at the time the cattle

were tendered, could not be obviated. It included an objection to all cattle which were stags, or very rough oxen, or not from three to six years old, or which had remained over night in a lot with a pond of water in it. None of these objections, they say, could have been obviated that day, and therefore it was not necessary for Colvin to say anything, more than that he would not receive that lot of cattle, because they did not fill the contract. We do not think so. Weedman offered to supply, by others, the cattle which were objectionable, as being stags, being very rough, or over six years old. He told Colvin to throw them out, and as to the other objection, if it was an objection, that they had been in a lot where there was water, over night, if Colvin really desired to comply with his contract, this could have been obviated by postponing weighing them for a few hours. Colvin's own witness, Cheney, testified that Weedman came up to Colvin when he was about to start away, and said to him he had better take the cattle, to which Colvin replied that he knew his own business. Weedman then said he was going to weigh the cattle, and if there were any in the lot that did not come up to the contract, he would throw them out. If, however, this objection had been made, it could have been obviated by delaying the weighing a few hours.

But, on the proof, Colvin was not entitled to these cattle; under the new arrangement with Hand, proof of which he had in his pocket, but failed to show Weedman, he was only entitled to take two or three car loads of them—some fifty or sixty—and that, too, without then paying for them. There were, certainly, that number which would fill the contract. The plaintiffs cannot be allowed, under these circumstances, as proved, to put defendants in default. The facts show they were the defaulting party, and being so, they have no claim to recover back the advance payment. The law of the case was well stated by the court in the instructions given for the defendants, and we can perceive no error in the record.

The judgment must be affirmed.

*Judgment affirmed.*